1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   RAE-YUEN LIU,                          CASE NO. 04-CV-1042-H (LSP)

12                          Petitioner,     ORDER DENYING SECOND
                                            AMENDED PETITION FOR
13        vs.                               WRIT OF HABEAS CORPUS
                                            28 U.S.C. § 2254
14   GWENDOLYN MITCHELL, Warden,

                                Respondent.
15

16        Petitioner Rae-Yuen Liu, a state prisoner proceeding with the assistance of retained

17   counsel, filed a petition for writ of habeas corpus, which she subsequently amended.[1]   28

18   U.S.C. § 2254.   Liu was convicted of murdering Robert Savela, with whom she had had a

19   stormy romantic relationship.   After an argument at the Mission Trails Park, Savela ended the

20   relationship and walked away.   Liu drove her car toward Savela but upon hitting a concrete

21   obstruction in the gravel parking lot, Liu accelerated and pinned Savela to the guardrail with

22   her vehicle.   Savela died from his injuries.   Liu contends that she did not intend to hurt Savela,

23   but upon unexpectedly hitting the bump, she accidentally stepped on the accelerator pedal

24   _____

25        [1]Petitioner filed her original petition in May 2004. [Doc. No. 1] She submitted a first
     amended petition in October 2004, but the Magistrate Judge rejected it because Liu had not yet
26   responded to notice about the unexhausted claim. [Doc. No. 14]  After Liu exhausted her
     claims in state court (including the alleged error in the *voluntary* manslaughter jury
27   instruction), she filed another petition in November 2005 and captioned it has her *"Second*
     Amended Petition." [Doc. No. 29] This second amended habeas petition is the operative
28   pleading.
        Because the parties are familiar with the procedural history, including the proceedings
     in state court, the Court does not repeat those facts in this Order.

                                        - 1 -                              04-CV-1042

1   instead of the brake pedal.  Liu's primary argument in this habeas petition is that her due

2   process rights were violated when the trial court misstated the elements of crime of voluntary

3   manslaughter; consequently, she maintains that the jury had no choice but to find her guilty

4   of the greater offense of second degree murder.  She bases this argument on the California

5   Supreme Court's decision in *Lasko* that intent to kill is not a required element of voluntary

6   manslaughter, because that crime can also be committed by one who does not intend to kill but,

7   who kills in a sudden quarrel or heat of passion, acts in conscious disregard of human life and

8   knowing that the conduct endangers the life of another.  *People v. Lasko*, 23 Cal. 4th 101, 107-

9   11 (2000).  Because the error in the jury instruction on the lesser offense of manslaughter was

10  harmless given the strong evidence of Liu's intent to kill Savela and because Liu does not

11  allege any error regarding her second degree murder conviction, the Court denies Liu's second

12  amended petition for a writ of habeas corpus.

13  **Report and Recommendation by Magistrate Judge**

14       Liu raised three grounds for habeas relief:  (1) jury instruction error, the precise nature

15  of which is discussed below; (2) ineffective assistance of counsel; and (3) prosecutorial

16  misconduct.  Pet. at 6-8; Second Amend. Pet. at 6-8.  The petition was referred to a Magistrate

17  Judge to prepare proposed findings of fact and to recommend a disposition.  28 U.S.C. §

18  636(b)(1)(C).[2]  The Magistrate Judge recommended denial of all three grounds for relief.

19  Report and Recommendation (hereinafter "R&R").

20       Liu has a valid objection to part of the R&R because the Magistrate Judge analyzed the

21  wrong claim.  Supp. Obj. at 14-15.  In her original petition, Liu's first ground for relief claimed

---

22

23       [2]Warden Gwendolyn Mitchell filed an Answer for Respondent in September 2004, in
    which she alleged that Petitioner had not exhausted the claim of whether the failure to instruct

24  on involuntary manslaughter implicated her federal constitutional right to due process.
    Petitioner elected to stay the federal proceedings while she returned to state court to exhaust

25  that claim.  *See generally* Pet'r Mo. to Dismiss and Stay. [Doc. No. 19]  At the end of 2005,
    Petitioner reported that the claim had been exhausted amd filed a second amended petition with

26  the newly exhausted claim. In January 2006, the Magistrate Judge submitted a R&R for this
    Court's review.  R&R at 4 n.2. [Doc. No. 31]  Petitioner objected because she had not had the

27  opportunity to file a traverse.  Objections at 1-5. [Doc. No. 33]  Although a traverse is an
    optional pleading, the Court allowed Petitioner an opportunity to file a supplemental brief on

28  the merits of her claims which would be tailored to the findings and conclusions in the R&R.
    Petitioner filed that supplemental brief on April 17, 2006 and the Court has considered it in
    addition to the objections that Liu filed on February 13, 2006. [Doc. Nos. 33 & 35]

that the state trial court failed to instruct the jury on the crime of *in*voluntary manslaughter as a lesser offense.  Pet. at 6 & Attach. A.  The Respondent addressed that argument in its opposition brief.  Opp. at 16-19.  By contrast, in her second amended petition, Liu argued that the jury instruction that the trial court gave on *voluntary* manslaughter misstated the mental state element of that crime.  Second Amended Pet. at 6 & Attachment A; Supp. Obj. at 6-7 & n.4.  Because the second amended petition does not raise the claim of involuntary manslaughter, this Court does not adopt that part of the analysis in R&R.  R&R at 12-17.

Instead, the first ground for relief in the second amended petition argues that the failure to instruct on *voluntary* manslaughter *without intent to kill* violated her due process rights, namely, to have the jury instructed on a defense supported by the evidence and to have the jury instructed on every element of the crime.  Because the first claim presents a legal question, this Court has conducted a de novo review of this jury instruction claim based upon the argument that Liu presented in her second amended habeas petition.[3]

Liu does not object to the R&R's analysis of her other two claims – ineffective assistance of counsel and prosecutorial misconduct.  The Court adopts the R&R on those claims and concludes that those claims do not warrant habeas relief.

### Factual Background

Liu was born in Taiwan, learned to speak English, married an American in 1986, and moved to the United States with him in 1988.  RT 879-80.  In September 1995, Liu met the victim, Savela, through her husband.  RT 873-74.  At that time, Savela was divorcing Janice Wahlstrom.  Liu and Savela began a romantic relationship in October 1995.  RT 886-89.  For a few months in 1996, Liu and Savela lived together.  RT 903-04, 920-21.

The relationship deteriorated when Liu moved out in June 1996, but the pair continued to see each other over the next sixteen months.  *E.g.*, RT 937, 955, 968-77, 1013, 1023, 1044.  The relationship was stormy, as the couple had voracious verbal arguments and breakups.

---

[3]The Court denies Liu's request for an evidentiary hearing because the first claim presents a legal question that can be decided on the existing state court record.  *Harris v. Pulley*, 885 F.2d 1354, 1378 (9th Cir. 1989) (petitioner "not entitled to an evidentiary hearing to present a purely *legal* argument.  An evidentiary hearing is to present disputed facts.").

*E.g.*, RT 1499-00 (Liu); RT 234 (co-worker reports that they had an "on again/off again" relationship). During that time, Liu called and paged Savela excessively, and Savela kept a diary of their encounters. *See* RT 856 (between July 1996 and September 1998, Liu called Savela 2,053 times). The relationship was abusive. For example, Liu routinely threatened to harm Savela (and his daughter) and Liu occasionally physically attacked Savela. *E.g.*, CT 360 (in a June 26, 1997 recorded message, Liu said "I hate you so much I don't wanna' see you alive."), CT 363 (in a call taped on August 7, 1997 Liu said "You piss me off so bad. I'll kill you, I'll kill your daughter. I'll kill everybody."); RT 230-39 (co-worker reports incident when Savela had a black eye, which Savela attributed to his girlfriend and an incident when Liu broke into Savela's house, pushed, shoved, and hit Savela, and cut his hand with a knife); RT 794-95 (Savela made a diary entry on September 27, 1996 that Liu "Tries to suffocate. Tries to break my fingers, thumb, and nose. . . . Choke, squeeze" my neck as hard as she can); RT 816 (Savela's diary reports "pummeled me with fists" on August 31, 1997); RT 1008-12 (Liu describes knife incident); RT 1387. Savela began to collect articles on men in abusive relationships and to conduct research on restraining orders. *E.g.* RT 169, 172-74, 232.

In August 1998, Savela's ex-wife, Wahlstrom, moved back into his home, as a roommate for the benefit of their daughter. RT 146, 841, 844, 1057-59. That lead to many telephone calls and meetings over the next month. *E.g.*, RT 843 & 1060 (Savela spends night with Liu), 1079, 1088 (Savela discusses couples counseling with Liu). Savela told Liu that he was thinking of reconciling with Wahlstrom. RT 1099, 1111. In the days immediately before Savela died, the couple exchanged many telephone calls. *E.g.*,. RT 846-55. On the morning of Sunday, September 13, 1998, Liu hit Savela with her car and he died from his injuries. The critical issue at trial was Liu's mental state and whether she committed first or second degree murder, manslaughter, or vehicular manslaughter.

***Prosecution Case***

The prosecution advanced its theory that the murder was deliberate and premeditated and therefore sought a first degree murder verdict. *See generally* RT 2489-521 (prosecutor's closing argument). The prosecution relied on the long-history of Liu's threats to harm or kill

Savela as evidence of her express intent to kill.[4]  These threats were well documented as Savela, during the last two tumultuous years of the relationship, had saved the threatening messages that Liu had left on his answering machine, and had kept a diary reporting the instances that Liu had used physical force against him, harassed him, or threatened to injure or kill him.  *See generally* Resp't Opp. at 2-9 (quoting messages, including threats to kill the victim's minor daughter).  In particular, Savela's answering machine recorded a conversation between Savela and Liu on the evening before the killing in which she stated:  "Tonight you'll be dead. . . If not today, tomorrow, day after, someday, I'll get you. . . .  You're not going to have time to call the police. . . . I am threatening you now."  Clerk's Transcript at 311-26 (unofficial transcript of part of Sept. 13, 1998 tape recording); *see* RT at 281-88 (jury hears tapes, including 9/12/98 recording); RT at 2499-500 (prosecutor quotes tape in closing argument).  Moreover, Savela's ex-wife told the jury of the victim's portend of his own death.  As he left the house on Sunday morning to meet with Liu, he told Wahlstrom:  "If I'm not back by midnight, call the police because I'm dead."  RT at 160; *accord* RT 235 (Savela told co-worker, "If anything should ever happen to me, I want you to tell somebody.").

        In addition to the extensive history of verbal harassment and physical abuse by Liu, the prosecution supported its theory of first degree murder with expert testimony regarding the physical evidence at the scene.  A traffic accident reconstruction specialist, Ernest Phillips testified that pedal error was unlikely, especially since the car had a manual transmission.  RT 663-66, 2357-67.  Phillips based this conclusion, in part, on the evidence of the path of Liu's car to the point of contact with Savela which showed a "purposeful steering maneuver."  RT 691, 665 ("So had this collision occurred right up here [at the vault] where you could say, well, she's startled, she doesn't know what she's doing, she's going straight through, she hits the gas

---

[4]The prosecutor portrayed Savela as trying to extricate himself from the relationship with an erratic, violent woman.  *E.g.*, RT 151-53, 204, 231-34, 253-55, 332.  By contrast, the defense maintained that Savela manipulated and controlled Liu in order to use her as a sexual partner.  *E.g.*, RT  955-56, 968, 1002 ("I felt he treat me [like a] toy"), 1111-13; *accord* RT 1177 & 2328-29 (psychologists).  Liu contended the love relationship – despite the significant arguments – was sincere and mutual.  *E.g.*, RT 916, 930, 1090-92.  Although such evidence was more relevant to the stalking charge, it provided context to the couples' dysfunctional relationship, the arguments during the weekend of Savela's death, and Liu's claim of killing upon a sudden quarrel.

1   instead of the brake, she's got the clutch in, whatever, and she goes straight through, you might

2   have more of an argument. But *this is a turning to a location where Mr. Savela is*, and there's

3   nothing hindering her from turning more or less or the other direction") (emphasis added).

4   Phillips noted the point at which Liu's car accelerated and the substantial degree of her left

5   turn after hitting the vault (from the 12 o'clock position on the steering wheel to the 6 o'clock

6   position). RT 650-51, 656-57. He further testified that Liu was traveling at about 10 to 14

7   miles per hour when she hit Savela, but that the impact of hitting the vault, the puncture to the

8   tire, and the sharp turn would have slowed the vehicle down. RT 653-56.

9          Similarly, Police Officer Charles Vermillion, who arrived at the scene in response to

10   a 911 call and was an experienced traffic accident investigator, estimated from the tire tracks

11   that Liu's car had been traveling about 15 miles per hour at the time it struck the victim. RT

12   at 514, 551-53; *see also* RT 465-79 (witness describes "rooster tail of dust" behind Liu's car);

13   *accord* RT 368, 372-74, 377-79, 387 (Officer George Maglaras gives his opinion of assault

14   from tire tracks and acceleration marks at the scene). Officer Vermillion further testified that

15   this was not a "pedal error" situation given that Liu's vehicle had a manual transmission, and

16   that Liu backed up, stopped, and then steered her car through some shrubs and directly into

17   Savela's direction. RT 491, 498, 503, 510-12, 541-42, 561, 563, 569, 584-85; *accord* RT 387,

18   395-97 (Maglaras rules out pedal error); *cf.* Clerk's Transcript 99 (Vermillion's drawing of

19   scene).

20          At the very least, the prosecutor argued that the evidence supported a conviction on

21   second degree murder with implied malice, "which means an unintentional act dangerous to

22   life, deliberately performed, with knowledge of the danger and a conscious disregard for life

23   but no intent to kill." RT 2497-98, 2500-02.

24   ***Defense Case***

25          Liu's theory of the case was that it was an accident. Liu testified on her on behalf that

26   she did not intend to kill Savela. The parking lot was made of gravel, and there was an

27   elevated, concrete vault (or bunker) with a 3 to 4 inch rise in her path as she tried to catch up

28   with Savela to encourage him to return to the car to continue the discussion. *See* RT 1080-82

(Liu describes prior incident when she had followed Savela to get him back into her car).  Liu testified that when her front tire hit the bump created by the concrete vault, the jolt surprised her, she was confused and disoriented, and unintentionally stepped on the gas pedal instead of the brake.  RT 1125-36, 1405-15.  Liu told the police officers both at the scene and during her subsequent interview at the station that she had not hit Savela on purpose and thought she had her foot on the brake.  *E.g.*, RT 489; Clerk's Transcript 261, 274-75.  Further, Liu told the jury that she had two prior driving accidents in which she had mistaken the gas pedal for the brake.  RT 1259-61 (similar mistake with handle controls on a scooter).

The defense presented an expert who reconstructed the scene and gave his opinion that it could have been an accident and that Liu's car was probably going only 8 to 10 miles per hour.  RT 1544-53, 1568-73, 1590-92, 1597-98, 1611-13, 1662 (Plourd testified that tire tracks did not show acceleration before impact and after Liu hit the vault, but were consistent, along with damage to tires, with Liu's version); *accord* RT 2197, 2202, 2223-24, 2239, 2242 (ergonomic expert McGrath supports Liu's theory of pedal error).  The defense presented medical experts who testified that Liu had spatial difficulties and the coordination of a young child.  RT 1425-42, 1472-73 (occupational therapist van der Heever testifies about Liu's motor and visual deficits).

Liu further testified that she had had a stormy relationship with the victim but she maintained that her threats were idle.  *E.g.*, RT 990, 1106 (drinking made words "just blurb out of my mouth"), 1109 (made threats when upset but did not intend to carry them out); *accord* RT 1681-85 (Liu's ex-husband testifies that she had a temper but was not violent).  For example, though the couple had been arguing that weekend, they nonetheless had plans to go motorcycling riding, and they would often fight, break up, and then make up.  *E.g.*, RT 1101.  A psychologist testified that the Taiwanese culture, in which Liu had been raised, used dramatic language and that threats could be explained in reference to the belief in karma – if you hurt me, you will be hurt – and should not be taken literally.  RT 2038-40 (psychologist Mikamo explains that Taiwanese use of language can be considered shocking to Western cultures); RT 2067-82 (concept of karma); RT 2108; *accord* RT 1047-52 (Liu testifies to

threats used by parents and grandparents); RT 1166-70 (psychiatrist Mills testifies that Liu has cultural and family history of using threatening language but is not a violent personality – "Big bark, no bite.").

Liu's attorney asserted that she had not intended to kill Savela, that it had been an accident. *E.g.*, RT 2614, 2628 (arguing that physical evidence at scene, such as tire tracks and "vroom" noise, showed pedal error, not an intent to kill). Liu's attorney thus urged the jury to return a not guilty verdict on the grounds that Liu did not have the requisite mental state for first or second degree murder. To reinforce this argument *against* a murder conviction, Liu's attorney stressed that Liu had been acting in the heat of passion or upon sudden quarrel. For example, he noted that Liu would have been shocked by Savela's announcement that the relationship was over, by Savela's sudden action of jumping out of her car while it was still moving, and by hitting the unseen concrete vault in the parking lot.

The defense argued that the evidence could be interpreted to show that Liu acted in a heat of passion that would mitigate the crime from murder to manslaughter. *E.g.*, RT 2638-39. Liu's attorney told the jury that he did not think this was a strong theory and urged them to find the killing unintentional and accidental. *Id.* As another alternative, Liu's attorney suggested that her conduct in driving the vehicle could have been negligent given her impaired coordination, thereby justifying a conviction on vehicular manslaughter with ordinary negligence. *E.g.*, RT 2640-45. Thus, the attorney's first line of defense was a not guilty charge, but he attempted to minimize the harm by suggesting an alternative theory of a type of manslaughter.

### *Jury Instructions and Verdict*

The trial court used the model jury instructions that were then in effect to define the crime of voluntary manslaughter. The trial court told the jury that a required element of the voluntary manslaughter charge was the intent to kill, and that there was no malice aforethought if the killing occurred in a heat of passion.[5] RT 2698 (*see* Clerk's Transcript 191).

---

[5]The trial court used an edition of the California Jury Instructions Criminal ("CALJIC") which provided:

> Every person who unlawfully kills another human being without malice aforethought but *with an intent to kill*, is guilty of voluntary manslaughter in

1      On March 13, 2000, the jury returned a not guilty verdict on first degree murder, but

2  a guilty verdict on the second degree murder (by use of a dangerous weapon, a vehicle) charge

3  and also on the stalking charge.  RT 2727-29; Clerk's Transcript 529-31.  The jury left blank

4  the verdict forms for the lesser included offenses of voluntary manslaughter, vehicular

5  manslaughter with gross negligence, and vehicular manslaughter with ordinary negligence.

6  Clerk's Transcript 532-34.

7      Two months after the trial ended, in June 2000, the California Supreme Court

8  announced the *Lasko* decision.[6]  The California Supreme Court held that intent to kill was not

9  necessarily an element of voluntary manslaughter.  The Court reasoned that the crime could

10  also be committed if a person "acting with a conscious disregard for life, unintentionally kills

11  a human being, but the killing occurs during a sudden quarrel or in the heat of passion."

12  *Lasko*, 23 Cal. 4th at 108.  Thus, a person acting in the heat of passion who only intends to

13  injure or acts with reckless disregard of human safety – a lesser mental state than an intent to

---

15      violation of Penal Code section 192, subdivision (a).
         There is no malice aforethought if the killing occurred upon a sudden
16  quarrel or heat of passion.
         In order to prove this crime, each of the following elements must be
17  proved:
         1.  A human being was killed;
18        2.  The killing was unlawful; and
         3.  *The killing was done with the intent to kill.*
         A killing is unlawful, if it was neither justifiable nor excusable.
19  CALJIC 8.40 (6th ed.) (emphasis added).

20      [6]The *Lasko* decision was one of three decisions issued in June 2000 which analyzed the
elements of voluntary manslaughter and distinguished it from the other murder offenses.  The
21  *People v. Blakeley*, 23 Cal. 4th 82, 87-91 (2000), decision focused on the type of voluntary
manslaughter when the defendant killed in "unreasonable self defense" (as opposed to the heat
22  of passion type) and repeated that intent to kill was not an element of voluntary manslaughter.
The California Supreme Court held that "voluntary manslaughter is also committed when a
23  defendant, acting with conscious disregard for life and the knowledge that the conduct is life-
endangering, unintentionally but unlawfully kills while having an unreasonable but good faith
24  belief in the need to act in self defense."  *Id.* at 85.

25      In *People v. Rios*, 23 Cal. 4th 450, 460-70 (2000), the California Supreme Court held
that the prosecution did not have the burden of proving the *absence* of heat of passion (or
26  imperfect self defense) for a voluntary manslaughter conviction.  The Court held that neither
provocation nor an unreasonable belief in the need for self defense were an additional element
27  of that crime.  By contrast, evidence of provocation (or imperfect self-defense) is relevant to
the element of malice, which is a requirement for a murder conviction, but which "mitigate[s]
28  the offense by *negating the murder element of malice*, and thus *limit[ing]* the crime to
manslaughter."  *Id.* at 454.

1    kill – can be guilty of voluntary manslaughter. *Id.* at 109 (applying *People v. Freel*, 48 Cal.

2    436 (1874)). *Lasko* held that a person who acts "with conscious disregard for life," who knows

3    "such conduct endangers the life of another," and who "*unintentionally*" but unlawfully kills

4    in a sudden quarrel or heat of passion" is guilty only of voluntary manslaughter, not murder.

5    *Id.* at 104.

6         In response to the *Lasko* decision, CALJIC was amended and the current version of the

7    model jury instruction states that the mental state is "either with an intent to kill, or with

8    conscious disregard for human life."[7]  In Liu's trial, however, the jury was told that she had

9    to intend to kill Savela before it could convict her of voluntary manslaughter.  Liu contends

10   that it is up to the jury to decide whether there was sufficient evidence of heat of passion,

11   especially given the evidence of the highly contentious and emotional relationship between

12   Savela and Liu, and if properly instructed, the jury could have concluded on the evidence that

13   Liu had unintentionally killed Savela while acting with conscious disregard for human life.

14        Liu brought the *Lasko* decision to the attention of the trial court in a motion for a new

15   trial.  The trial court reasoned that "a new trial with the updated instructions would be of no

16   _____

17        [7]The current version of CALJIC 8.40 defines voluntary manslaughter as:
            Every person who unlawfully kills another human being [without malice

18   aforethought but] *either with an intent to kill, or with conscious disregard for
     human life*, is guilty of voluntary manslaughter in violation of Penal Code
     section 192, subdivision (a).

19        [There is no malice aforethought if the killing occurred [upon a sudden

20   quarrel or heat of passion] [or] [in the actual but unreasonable belief in the
     necessity to defend [oneself] [or] [another person] against imminent peril to life
     or great bodily injury].]

21        The phrase, "conscious disregard for life," as used in this instruction,
     means that a killing results from the doing of an intentional act, the natural

22   consequences of which are dangerous to life, which act was deliberately
     performed by a person who knows that his or her conduct endangers the life of

23   another and who acts with conscious disregard for life.
          In order to prove this crime, each of the following elements must be

24   proved:
            1.  A human being was killed;

25          2.  The killing was unlawful; and
            3.  The perpetrator of the killing *either intended to kill the alleged victim,*

26   *or acted in conscious disregard for life*; and
            4.  The perpetrator's conduct resulted in the unlawful killing.

27   [A killing is unlawful, if it was [neither] [not] [justifiable] [nor] [excusable].]

28   CALJIC 8.40 (Fall 2006) (emphasis added).

benefit in this case, that the implied voluntary manslaughter theory would not fly."  RT 2746

("this case is replete with evidence that revenge was on her mind at every step of the way.").

In the direct appeal, the California Court of Appeal acknowledged that the jury instructions

given in Liu's case violated the rule announced in *Lasko*, but held that omitting the conscious

disregard standard while including only the intent to kill element of voluntary manslaughter

was harmless error.  Lodgment 20.

**Discussion**

**Violation of a Federal Constitutional Right**

A federal court may entertain a writ of habeas corpus "only on the ground that [a state

prisoner] is in custody in violation of the Constitution or laws or treaties of the United States."

28 U.S.C. § 2254(a). On one level, Liu's claim could be construed as an simply an issue of

state law regarding the definition of the statutory crime of voluntary manslaughter and the

corresponding jury instructions.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("the fact that

the instruction was allegedly incorrect under state law is not a basis for habeas relief"); *Illinois

v. Vitale*, 447 U.S. 410, 416 (1980) (federal courts must accept state high court's identification

of elements of crime).  Under that interpretation, the state law claim would not be cognizable

in this federal habeas petition.

Liu, and the R&R, assert that there is a constitutional due process right to instruct the

jury on the essential elements of the offense.  Second Amend. Pet. at 7 ¶(b); R&R at 15.  For

this proposition, Liu cites *United States v. Gaudin*, 515 U.S. 506, 510-10 (1995).  That case,

however, concerned a slightly different issue.  The Supreme Court held that "[t]he Constitution

gives a criminal defendant the right to demand that a jury find him guilty of all the elements

of the crime with which he is charged" rather than to have the trial court determine an element

as a legal question.  *Id.* at 509-11 (citing Fifth Amendment due process and Sixth Amendment

right to jury trial); *see Cabana v. Bullock*, 474 U.S. 376, 384 (1986) ("A defendant charged

with a serious crime has the right to have a jury determine his guilt or innocence, and a jury's

verdict cannot stand if the instructions provided the jury do not require it to find each element

of the crime under the proper standard of proof.") (citing cases based upon Sixth and

Fourteenth Amendments).  Here, the jury *convicted* Liu of second degree murder, and Liu does not contend that the jury did not unanimously decide each of the elements of that offense.[8] Rather, she extrapolates from the rule of *Gaudin* that a state court defendant also has a federal due process right to jury instructions on each element of lesser included offenses (here, voluntary manslaughter) that were not the basis of the conviction.  *But see Keeble v. United States*, 412 U.S. 205, 213 (1973) (in a direct criminal appeal by a federal defendant in a non-capital case, the Court stated "we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right of a defendant to have the jury instructed on a lesser included offense" but declining to reach question in that case).  While Liu's extension of the *Gaudin* principle to the right to *accurate* jury instructions on those *essential elements* of all the *charged offenses* may be reasonable, there is no clearly established Supreme Court authority on that point.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

/ / / /

---

[8] Liu does argue that the absence of the *Lasko* instruction (*i.e.*, that one who does not intend to kill but who acts in conscious disregard for human life can be guilty of voluntary manslaughter rather than second degree murder) amounts to a constitutional error under *Gaudin*.  Second Amend. Pet. at 6 ¶ (a).  "This is so because, under California law, murder requires that the prosecution negate manslaughter as an element of the offense; hence, an error instructing on manslaughter was an error in instructing on the necessary elements of the charged crime."  *Id.*

This is incorrect.  California law defines second degree murder as the unlawful killing of a human being with malice aforethought.  Cal. Penal Code §§ 187, 188, 189.  The concept of a defendant acting in a "sudden quarrel or heat of passion" is used to define voluntary manslaughter.  Cal. Penal Code § 192(a).  Ordinarily, it is the defendant who introduces evidence of heat of passion in order to reduce murder to the lesser offense, but voluntary manslaughter is a separate crime.  *People v. Breverman*, 19 Cal.4th 142, 159 (1998).

By contrast, as discussed below in footnote 10, because Liu introduced evidence of a sudden quarrel or heat of passion, the prosecution did have the burden of negating *heat of passion* as part of its case to show the defendant acted with malice.  *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975) (the prosecution must "prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case"); *People v. Bloyd*, 43 Cal. 3d 333, 349 (1987).  Here, the jury determined that the prosecution met that burden when it returned the guilty verdict on second degree murder.

Liu makes another misstatement when she states that "one of the essential elements of murder is the absence of malice – meaning as pertinent here, the absence of manslaughter as defined by *Lasko*."  Second Amend. Pet. Attachment A at 7 ¶ (b).  The reverse is true as California law defines murder as a killing committed *with malice*.  *Rios*, 23 Cal. 4th at 460.  California law defines malice in several ways, for example, implied malice.  Cal. Penal Code § 188.  While heat of passion negates malice, *People v. Watson*, 30 Cal. 3d. 290, 300 (1981), this jury concluded that Liu acted with malice and not in the heat of passion. (It is possible that the quote is simply an error and that Liu meant to say that an essential element of "manslaughter" is the absence of malice.)

In the alternative, Liu contends that her claim raises a constitutional due process issue relative to the requirement to provide an opportunity to present a defense on a theory that is supported by the facts.[9]  Liu cites *Mathews v. United States*, 485 U.S. 58, 63 (1988) for that proposition.  That case, however, was a direct appeal from a federal criminal conviction.  The Supreme Court did not identify a constitutional clause as a source of its holding; instead, the Court recognized as a  "general proposition" that a federal criminal defendant is entitled "an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  *Id.*; *see id.* at 890 (White, J., dissenting) ("The Court properly recognizes that its result is not compelled by the Constitution").  There is Ninth Circuit authority that, in some non-capital cases, a defendant's right to *adequate* jury instructions on her theory of the case might present a federal constitutional issue.  *Solis*, 219 F.2d at 929 (citing *Beck*, 447 U.S. at 632-38 & n.14 (reserving the question) and *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  But under the Antiterrorism and Effective Death

/ / / /

---

[9]As to the constitutional right to present a defense, Liu's case is distinguishable from those cases in which the trial court *refused* to instruct the jury on *any* lesser offense.  *Cf. Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002) (granting habeas relief for due process violation when state trial court failed to give entrapment instruction because fundamental fairness requires "'that criminal defendants be afforded a *meaningful* opportunity to present a complete defense'") (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984) (emphasis added)); *but see James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) (per curiam) (failure to give lessor included offense jury instruction "fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding").  Here, although the prosecution sought a murder conviction (first or second degree), the trial court instructed the jury on three types of manslaughter (voluntary, vehicular with gross negligence, and vehicular with ordinary manslaughter).  Both types of vehicular manslaughter encompassed an unintentional killing.  Cal. Penal Code § 192 (c)(1), (c)(2); Clerk's Transcript 196 & 198 (giving CALJIC 8.90).  Thus, the jury was not presented with an "all or nothing" choice that could implicate fair trial concerns. *See Beck v. Alabama*, 447 U.S. 624, 638 (1980) (explaining concerns in context of capital case).

Liu identifies other possible federal constitutional claims but none of them apply to her case.  SAC, Attachment A at 11-12.  This case does not present an *In re Winship*, 397 U.S. 358, 364 (1970) issue regarding the State's burden to prove every element of the crime because the jury convicted Liu of second degree murder.  By contrast, Liu's habeas deals with the elements of a lesser offense, which the jury did not reach and which is not the basis of Liu's custody.  *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (per curiam).  Similarly, there is no basis to assert that the State required the defendant to prove the absence of a fact on that lesser offense.  *Mullaney*, 421 U.S. at 704.  Because Liu presented evidence of a quarrel, the trial court instructed the jury that *the prosecution* had the burden of proving beyond a reasonable doubt the *absence of heat of passion* for a murder conviction.  RT 2700 (giving CALJIC 8.50, *see* Clerk's Transcript 195).

Penalty Act (AEDPA), only clearly established Supreme Court authority provides a basis for federal habeas relief.  28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405.

Thus, it is questionable whether Liu has identified a Supreme Court case that directly controls the facts of her habeas petition.  If the *Gaudin* authority is extended and combined with the implications of the *Mathews* case, it is possible that Liu has articulated a colorable argument to apply these legal principles to her particular case so as to assert a constitutional claim rather than a question of state law.  Second Amend. Pet. at 6 ¶(a) & (b); Supp. Obj. at 15-19.  For the purpose of deciding her habeas petition, the Court will assume that Liu has presented a colorable theory on which her claim could be construed to raise a constitutional due process violation.

In any event, the federal constitution is implicated if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72 (quotation and citation omitted); *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003) (granting habeas relief when erroneous jury instruction on mental state element violated federal due process clause).  The Court concludes, at the very least, that Liu has raised a question of whether the *Lasko* error in the voluntary manslaughter instruction "so infected the entire trial" to rise to the level of a due process violation.  *See Tata v. Carver*, 917 F.2d 670, 671-72 (1st Cir. 1990) (collecting Circuit cases showing split of authority and concluding that miscarriage of justice due process standard applies to non-capital habeas petitions).  Therefore, the Court will proceed to the merits of her claim.

**Habeas Standard**

Under AEDPA, a writ of habeas corpus may issue only if the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d).  Liu argues that the Court should apply the "contrary to" test, not the unreasonable application clause of AEDPA.  Supp. Obj. at 12-13.  "Under the 'contrary to' clause, a federal court should grant the writ (1) when the state court has failed to apply the correct controlling authority from the Supreme Court or (2) when the state court has applied the correct controlling authority from the Supreme Court to a case

1   involving facts 'materially indistinguishable' from those in a controlling case, but has

2   nonetheless reached a different result." *Shackleford v. Hubbard*, 234 F.3d 1072, 1077 (9th Cir.

3   2000).

4           The Court concludes that Liu is not entitled to habeas relief even if her claim is

5   construed to have a federal constitutional dimension.  It is imperative to keep in mind that the

6   jury instruction error raised by Liu was *not in the crime of conviction.  Masoner v. Thurman*,

7   996 F.2d 1003, 1008-09 (9th Cir. 1993).  Liu was convicted of *second degree murder.  Id.*

8   (denying habeas on claim of instructional error in lesser manslaughter offenses because

9   conviction of second degree murder not affected).  Liu does not challenge the sufficiency of

10  the evidence supporting the second degree murder conviction, nor does she otherwise

11  challenge the validity of that conviction in this federal habeas petition.  Instead, she asserts an

12  error in the instruction for voluntary manslaughter, one of the lesser crimes on which the jury

13  did *not* return a verdict.  Consequently, like the petitioner in the *Masoner* case, Liu's due

14  process claim fails on the particular facts of her case.  *Id.*

15          Liu has not cited a controlling Supreme Court case involving a jury instruction error in

16  a lesser crime given to the jury but *not* reached by the jury.  Thus, Liu's situation is quite

17  different than those cases granting federal habeas relief when the instructional error in state

18  court was in the crime of conviction.  *E.g.*, *Evanchyk v. Stewart*, 340 F.3d 933, 935-42 (9th Cir.

19  2003) (omitting intent element from instructions in crime of conviction violated federal due

20  process rights because jury could have convicted defendant for activity that did not constitute

21  a crime under state law); *Ho*, 332 F.3d at 589-90, 592, 596; *Masoner*, 996 F.2d at 1009

22  (distinguishing *Schwendeman v. Wallenstein*, 971 F.2d 313, 316 (9th Cir. 1992), where jury

23  instruction error concerned an element of the crime of which defendant was convicted)).

24          Assuming that there was an error of constitutional dimension, Liu also complains that

25  the state court applied the wrong standard of review.  Second Amend. Pet. at 6-7; Supp. Obj.

26  at 12-13.  As noted, Liu argues that the *Lasko* claim constitutes federal constitutional error

27  because it involved the elements of the crime, specifically, the mental state the government

28  was required to prove to meet its burden to prove voluntary manslaughter.  Liu thus argues that

the state court should have applied the *Chapman* harmless error standard used to review constitutional trial-type errors. *Chapman v. California*, 386 U.S. 18, 23-24 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"); *Bains*, 204 F.3d at 971 n.3.[10] She argues that the state court's application of a "reasonable probability" rule "contradicts" the *Chapman* precedent to apply a harmless error standard of "beyond a reasonable doubt."

The Court agrees with Liu that the state court impliedly determined that the jury instruction error was not one of constitutional magnitude because it applied the same standard of harmless error that the California Supreme Court applied in *Lasko* which examined whether it was "reasonably probable that a properly instructed jury would have convicted Liu of the lesser offense of voluntary manslaughter based on heat of passion rather than second degree murder." Lodgment 20; *People v. Liu*, 2001 WL 1528894 at *3-4 (Cal. Ct. Appeal Dec. 3, 2001); *see Lasko*, 23 Cal. 4th at 111 (applying *Watson* harmless error standard to review error of state law definition of crime). "The *Watson* harmless error standard is the standard applied by California state appellate courts in reviewing non-constitutional magnitude, trial type errors." *Bains*, 204 F.3d at 971 n.2 (citing *People v. Watson*, 46 Cal. 2d 818 (1956)).

This argument does not entitle Liu to any substantive relief, however, because federal courts apply the *Brecht* standard to a habeas claim *regardless* of what type of harmless error review (whether *Watson* or *Chapman*) the state court applied to the claim. *Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000). Thus, even assuming there is a constitutional dimension to Liu's claim, the Court applies the *Brecht* standard to Liu's claim that the failure to instruct

---

[10]Petitioner misstated the holding of *Chapman* in her supplemental objections. Liu described *Chapman* as holding that an erroneous jury instruction on the elements of an offense constitutes federal constitutional error. Supp. Obj. at 3. But *Chapman*, 386 U.S. at 19, involved the prosecutor's comment on the defendant's failure to testify and the trial court instructed the jury that it could draw an adverse inference from the defendant's silence. The Supreme Court held that this violated the federal constitutional right not to be compelled to be a witness against himself. *Id.* at 19-20 (citing *Griffin v. California*, 380 U.S. 609 (1965) (applying Fifth Amendment to states through Fourteenth Amendment). By contrast, "[w]hether a conviction for a crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied." *Id.* at 21.

1    the jury that voluntary manslaughter could be committed by a person acting in conscious

2    disregard of the danger to human life prejudiced her state court trial.  The *Brecht* standard

3    examines whether the error had a "substantial and injurious effect or influence in determining

4    the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 636-38 (1993); *Bains*, 204 F.3d at

5    971 n.2.  The error is harmless unless the habeas petitioner can establish "actual prejudice."

6    *Brecht*, 507 U.S. at 637.

7    **Harmless Error Analysis on Lesser Offense of *Lasko*-type Voluntary Manslaughter**

8           Liu maintains that she has identified a sufficiently egregious and prejudicial error

9    because the jury could have convicted her of voluntary manslaughter if the jury had been

10   instructed that conscious disregard was a sufficiently culpable mental state.  Liu states that the

11   *Lasko* instruction would have allowed her to make a strong argument to the jury that Liu was,

12   at best, guilty of voluntary manslaughter.  Instead, the trial court gave an instruction that

13   specifically told the jury that the defendant must have had the intent to kill; consequently, the

14   defense was bound by that *pre-Lasko* definition.  RT 2698.  "[T]he defense had to argue for

15   voluntary manslaughter only in the context of an intentional killing committed in the heat of

16   passion – a theory which was presented merely in the most perfunctory manner because it was

17   inconsistent with the primary defense theory of an accidental killing."  Second Amend. Pet.,

18   Attachment A at 5, 10 & n.5.  This problem was exacerbated because the jury was not

19   instructed on the alternative theory of *involuntary* manslaughter.  *Id.* at 9.  Liu's theory of the

20   case was that she had *not intended* to kill Savela, but had accidentally mistaken the gas pedal

21   for the brake pedal upon hitting the vault with her tire.  Under the *Lasko* definition of voluntary

22   manslaughter as *either* intent to kill *or* conscious disregard for human life, Liu contends that

23   she could shown that she acted unlawfully (*i.e.*, in conscious disregard of the consequences by

24   recklessly manipulating the vehicle toward Savela) *but without an actual intent to kill* (*i.e.*,

25   only intending to catch up with Savela but losing control of the car when she hit the concrete

26   vault and then accidentally hitting Savela).  In short, Liu argues that the jury was deprived of

27   the choice of convicting Liu of the lesser charged offense.  Liu further argues that the jury was

28   receptive to a theory that Liu acted with conscious disregard but without an intent to kill

1   because the jury rejected the prosecution's first degree murder theory of intentional, planned,

2   and purposeful action.

3        The Court concludes that the omission of the conscious disregard standard from the

4   voluntary manslaughter jury instruction did not have a substantial effect on the jury's verdict,

5   which found Liu guilty of second degree murder. *See Neder v. United States*, 527 U.S. 1, 8-17

6   (1999) (applying harmless error to *Gaudin* error when jury instructions omitted element of

7   offense). The Court has examined the entire record and considers the evidence, the overall

8   jury instructions, and other aspects of the trial.

9        There was overwhelming evidence of *express* malice because Liu had verbally

10   threatened to kill Savela on the night before the incident. The jury heard Liu's own threatening

11   words and hateful tone because Savela had recorded that conversation on his answering

12   machine. On prior occasions, Liu had repeatedly threatened to kill Savela and had actually

13   physically injured him at least two or three times. The jury heard of Savela's extensive diary

14   entries which described the long history of Liu's threats of violence and acts to punish him

15   when she was upset with the course of the relationship. Friends of Savela described prior

16   physical injuries and testified that Savela feared Liu's quick temper. The jury also had

17   physical evidence from the scene of the attack because the path of her car, as shown by the tire

18   tracks on the gravel lot *after* she hit the concrete vault, showed that Liu had steered through

19   the bushes to hit Savela with her front bumper. Thus, direct evidence supports a second degree

20   murder conviction based on express malice – that Liu had intent to kill – and the *Lasko*

21   conscious disregard instruction would not have influenced this jury's verdict. *See Pope v.*

22   *Illinois*, 481 U.S. 497, 502-03 & n. 6 (1987) (citing *Rose v. Clark*, 478 U.S. 570, 580-81 & n.8

23   (1986) for proposition that instructional error in intent element can be harmless when "'the

24   predicate facts conclusively establish intent'" such that the reviewing court can say "that the

25   facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had

26   never heard the impermissible instruction its verdict would have been the same").

27        It is equally apparent that there was ample evidence of Liu's *implied* malice necessary

28   to a second degree murder conviction, which is "'when the killing results from *an intentional*

*act*, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who know that [her] conduct endangers the life of another and who acts with conscious disregard for life.'" *Lasko*, 23 Cal.4th at 107 (emphasis added) (quoting *People v. Dellinger*, 49 Cal. 3d 1212, 1215 (1989)); *see Masoner*, 996 F.2d at 1006-07 (discussing California's implied malice concept). In returning the second degree murder conviction, the jury necessarily found that Liu intended to drive her car into Savela that morning.[11] The jury rejected Liu's pedal error defense, and substantial physical evidence and expert opinion supported that conclusion. There was more than sufficient evidence to support the jury's second degree murder conviction on this type of implied malice; therefore, Liu was not prejudiced by the error in the lesser offense of voluntary manslaughter. *Masoner*, 996 F.2d at 1008 (federal court need not reach habeas claim of instructional error on the lesser included offenses, there, involuntary manslaughter and vehicular manslaughter, because jury convicted petitioner of second degree murder and petitioner did not allege any error in those instructions); *see Shackleford*, 234 F.3d at 1078-79 (erroneous jury instruction did not infect entire trial given jury's verdict).

While Liu's habeas petition focuses on those viable facts that could have justified a conviction for voluntary manslaughter (if the broader instruction from the *Lasko* case had been used), the jury found that she was more culpable and convicted her of second degree murder. Thus, Liu was not prejudiced by the absence of the *Lasko* instruction. In reaching this conclusion, the Court has in mind the excellent defense case presented on Liu's behalf. Liu's trial counsel was extremely thorough and prepared. He effectively cross examined the prosecution witnesses, and then presented a stream of witnesses (including the defendant and

---

[11]The Court finds no merit in Liu's contention that the jury's rejection of the first degree murder charge "indicates the jury *rejected* the prosecution's theory that Petitioner killed Savela intentionally, and found instead that he died as a result of the Petitioner's wanton and reckless[] manipulation of the vehicle, and her conscious disregard for the consequences." Objections at 10. First degree murder is second degree murder *plus deliberation and premeditation.* Cal. Penal Code §§ 187, 188, 189. The jury's not guilty verdict on first degree murder means the jury rejected the prosecutor's argument that Liu had *deliberated*, for instance, whether she had formed the plan to kill Savela on the night before they met at the park. RT 2704 (giving CALJIC 8.73, *see* Clerk's Transcript 204, that jury could use evidence of *inadequate* provocation to assess whether Liu killed without deliberation and premeditation).

character witnesses) to advance Liu's defense.  The comprehensive range of experts included cultural and psychological specialists who minimized Liu's verbal threats as well as ergonomic and traffic accident reconstruction specialists who supported her theory of pedal error.  This was a case in which the defense presented a strong case for acquittal but the jury rejected the defendant's version of the events that the killing was an accident.  *Solis*, 219 F.3d at 926-30 (state trial court did not violate defendant's due process rights by declining to give voluntary manslaughter instructions, when jury's second degree murder verdict was based upon valid jury instructions).

The jury returned a guilty verdict on the second degree murder charge and Liu does not challenge the validity of that unanimous verdict on the greater offense of killing with malice. Liu's argument in this habeas petition that the jury would have inclined to convict, if so instructed, on the *Lakso*-type voluntary manslaughter – without the intent to kill but in conscious disregard of the danger to human life – is speculative.  The second degree guilty verdict in this case means the jury necessarily found that the prosecution had proven beyond a reasonable doubt that Liu acted *with* malice (*i.e.*, the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life, and the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life) and had *not* acted in the heat of passion.  *Compare* Cal. Penal Code §§ 187, 188, 189 *with* § 192; *see Masoner*, 996 F.2d at 1005 (when a California jury returned second degree murder verdict, "the jury necessarily found beyond a reasonable doubt that [defendant] acted with malice").

Liu devotes much of her brief to the evidence showing she acted in a heat of passion and her contention that "the jury did not necessarily reject a heat of passion defense entirely, but only within the context of voluntary manslaughter." Obj. at 17; Second Amend. Pet., Attachment A at 3-4; Supp. Obj. at 8-12 (summarizing facts that support heat of passion theory); Supp. Obj. at 15-19.

The Court rejects this argument.  It is true that Liu presented some evidence regarding her heat of passion theory.  Consequently, the trial court instructed the jury that the prosecution had the burden of proving that Liu had *not* acted in the heat of passion or upon a sudden

quarrel." RT 2700 (giving CALJIC 8.50, *see* Clerk's Transcript 195). The second degree murder conviction, however, means that the jury rejected Liu's evidence and found that she had acted with malice. The guilty verdict on the greater offense of murder also means the jury concluded that Liu was *not* acting in the heat of passion at the moment she drove her car toward Savela. Heat of passion mitigates a crime that would be murder to the lesser charge of manslaughter "out of forbearance for the weakness of human nature." *People v. Freel*, 48 Cal. 436, 437 (1874). Heat of passion will reduce murder to manslaughter only if (1) "the killer's reason was actually obscured as the result of a strong passion"at the time of the killing and (2) the "provocation" was "sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than judgment." *People v. Breverman*, 19 Cal. 4th 142, 163 (1998) (citations and alterations omitted). The victim must cause the provocation; and while the passion can be anger or any other intense emotion, it cannot be revenge. *Id.* The jury's conclusion is fully supported by the record. The jury heard significant evidence that Liu was quick tempered and vengeful. Given the history of the couple's relationship, the jury could easily conclude that the argument preceding the killing could not provide a reasonable justification for Liu's supposed loss of judgment. For instance, the jury heard evidence that Savela had repeatedly broken off the relationship only to make up with Liu later and heard testimony that Liu knew Savela's ex-wife had moved in with him one month before the events of September 13. On this record, there was significant evidence that Liu's temper was not a reason to reduce the crime from murder to manslaughter.

In addition, Liu's trial strategy was to seek a "not guilty" verdict on all counts because she maintained the killing was accidental. The jury rejected Liu's contention that she had acted in the heat of passion thus the jury would not have elected to reduce murder to manslaughter. The jury was also given the option of convicting Liu on the vehicular manslaughter charges. *See Murtishaw v. Woodford*, 255 F.3d 926, 955 (9th Cir. 2001) (jury was "expressly presented with a range of options, which eliminated the 'enhanced risk of an unwarranted conviction'") (quoting *Beck*, 447 U.S. at 637). In all, the Court concludes that

given the strong evidence of Liu's intent to kill Savela when she drove the car into him and crushed him between the guardrail and the front bumper, there is little, if any, likelihood that the *Lasko* instruction would have changed the result of her trial.

In addition to the weight of the evidence against Liu, there are other reasons to reject Liu's argument that the jury would have determined Liu guilty of the *Lasko*-type of voluntary manslaughter had they been offered that alternative definition. The Court looks to the overall instructions given to the jury. *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973) for proposition that when federal courts review the effect that challenged jury instructions may have had on the verdict, they "must be viewed in the context of the overall charge"); *see Villafuerte v. Stewart*, 111 F.3d 616, 625 (9th Cir. 1997) (citing *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995)).

The Court assumes that the jury followed the trial court's instructions. *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) (The Supreme Court "presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them."). Liu's jury was instructed that it could consider and discuss all of the evidence relative to all of the various charges in any order during their deliberations, but when returning the final verdicts, the jury was required to find unanimously not guilty of second degree murder *before* returning a verdict of guilty on voluntary manslaughter. RT 2705-06 (giving CALJIC 8.75)[12]; *see* RT 2531 (defense attorney reminds jury of duty to analyze the elements, but that they "had to decide murder before you get to manslaughter"); *see generally People v. Kurtzman*, 46 Cal. 3d 322, 324-25 (1988) (explaining that CALJIC 8.75 "properly interpreted, simply restricts a jury from returning a verdict on a lesser included

---

[12]In relevant part, CALJIC 8.75 instructed the jury about the lesser included offenses, and stated that the jury "had discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it"; however, "The Court cannot accept a verdict of guilty of second degree murder as to Count One unless the jury also unanimously finds and returns a signed verdict form of not guilty as to murder in the first degree in the same Count. . . . If you unanimously find defendant not guilty of first degree murder, but guilty of second degree murder, your presiding juror should sign and date the corresponding verdict forms. Do not sign any other verdict forms as to that Count." Clerk's Transcript 206-07; RT 2705-06.

offense before acquitting on a greater offense and does not preclude a jury from considering lesser offenses during its deliberations."); *cf. United States v. Jackson*, 726 F.2d 1466, 1469 (9th Cir. 1984) (holding that instruction similar to CALJIC 8.75 may be read to jury).  Here, the jury returned a guilty verdict on the second degree murder charge, thereby rejecting Liu's defense that she was less culpable.  At no time did the jury indicate that it could not reach an agreement on the second degree murder verdict (or any of the other charges).

Several jury instructions emphasized the difference between murder and manslaughter. *E.g.*, RT 2696 (noting that heat of passion can preclude deliberation necessary for first degree murder);  RT 2700 (explaining that "even if an intent to kill exists, the law is that malice , which is an essential element of murder, is absent"); RT 2698-700 (giving CALJIC 8.42 to 8.44, *see* Clerk's Transcript 192-94, explaining when heat of passion reduces murder to manslaughter).  For example, one instruction emphasized that "[t]o establish that a killing is murder and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the defendant [sic, death] was not done in the heat of passion or upon a sudden quarrel."  RT 2700 (giving CALJIC 8.50, *see* Clerk's Transcript 195).  The jury was further instructed that if the jury had a "reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder."  RT 2703-04 (giving CALJIC 8.72, *see* Clerk's Transcript 203); *see also* RT 2684-85 (giving CALJIC 2.02, *see* Clerk's Transcript 155, regarding reasonable interpretation of evidence of defendant's mental state).  Moreover, the trial court gave many instructions favorable to Liu's accident and heat of passion theory.  *E.g.*, RT 2694 (giving CALJIC 4.45 *see* Clerk's Transcript 183, "when a person commits an act . . . through misfortune or by accident . . . she does not thereby commit a crime").  The record shows that the jury was well-educated about the lesser alternatives but nonetheless returned a guilty verdict on the second degree murder charge.  For instance, the jury had the choice of the convicting Liu of vehicular manslaughter charges if they believed that she did not intend to kill Savela but nonetheless had been negligent in driving her car towards him that morning.  Neither attorney argued that Liu was guilty of murder if she had

1  "unintentionally" killed Savela in a heat of passion, thus, the arguments of counsel did not

2  incorrectly influence the jury.

3       Finally, the jury conscientiously reviewed the evidence and asked many questions

4  during their six days of deliberations, but none of the questions concerned the requisite mental

5  state for the various levels of murder or manslaughter.  Clerk's Transcript 133, 136, 138, 142,

6  143, & 145; *see also id.* at 520-28; *cf. Beardslee v. Woodford*, 327 F.3d 799, 812-13 (9th Cir.

7  2003) (state trial violated due process right to fair trial by failing to clarify jury's question

8  about a pivotal but incorrect instruction).  This jury did not indicate that it was deadlocked on

9  the crime of conviction.  *Cf. Bartlett v. Alameida*, 366 F.3d 1020, 1024 (9th Cir. 2004) (per

10  curiam).  The jury was polled and no juror expressed misgivings about the second degree

11  murder verdict.  RT 2729-30.

12       In sum, the Court finds that the instructional error was harmless on the facts of this case.

13  Accordingly, Liu is not entitled to habeas relief.

14                              **Conclusion**

15       Upon due consideration of the parties' memoranda, exhibits, and objections; a thorough

16  review of the record; and for the reasons set forth above, the Court adopts in part the Report

17  and Recommendation and the objections to that R&R.  [Doc. Nos. 31, 33, 35]  The Court

18  denies the second amended petition for writ of habeas corpus. [Doc. No. 29]  The Clerk of the

19  Court shall close this civil case.

20       IT IS SO ORDERED.

21  DATED:   February 22, 2007      _____

22                              MARILYN L. HUFF, District Judge
                                UNITED STATES DISTRICT COURT

23

24

25

26

27

28  cc:    All Parties
           Magistrate Judge Papas